## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOAN THOMAS, as ADMINISTRATOR of the ESTATE OF CHRISTOPHER THOMAS,** | : |
| **Plaintiff,** | : |
| **v.** | : **No. 25-cv-_____** |
| **PRIMECARE MEDICAL, INC.; HEATHER O'DONNELL, LPC; ASHLEY SIMMERS, LPC; MEGAN SERPICO, RN; TRACY KENION, LPN; DANA HUNSINGER, LPN; CARBON COUNTY; CORRECTIONAL OFFICER JAMES JELLYMAN; ASSISTANT DEPUTY WARDEN RIMBY; SERGEANT ERIC FLEXER,** | : **JURY TRIAL DEMANDED** |
| **Defendants.** | : |

## COMPLAINT

## I. PRELIMINARY STATEMENT

1.     This is a civil rights survival and wrongful death action brought under

42 U.S.C. § 1983 and the Americans with Disabilities Act concerning the

defendants' deliberate indifference to the fact that decedent Christopher Thomas

was particularly vulnerable to suicide while detained at the Carbon County

Correctional Facility ("CCCF").

2.      Mr. Thomas had long suffered from mental illness, as well as drug use, and was taken into CCCF custody the evening of June 26, 2023 after being arrested on charges related to a domestic dispute with his wife, plaintiff Joan Thomas.

3.      Defendants were immediately aware of Mr. Thomas's particular vulnerability to suicide because of his mental health history, psychiatric diagnoses, and, most notably, the fact that he had attempted to kill himself just prior to his arrest by stabbing himself in the neck and arms. He was admitted to CCCF with visible gashes on both sides of his neck.

4.      At the outset of his time at CCCF, defendants ensured that appropriate precautions were in place to ensure Mr. Thomas's safety. He was placed in a secure cell and closely monitored.

5.      Within days, however, despite their knowledge of severe and persistent risks that Mr. Thomas would harm himself, defendants rapidly reduced these precautions. After just seven days, defendants removed Mr. Thomas from suicide watch entirely, placing him on Level III watch, a status requiring only thirty-minute checks by a correctional officer with no other safety precautions. Under defendants' policies and practices, this level of precaution is expressly not used to protect against risks of suicide and self-harm.

6.      On July 4, 2023, roughly seven hours after he was placed on Level III status, Mr. Thomas was found in his cell hanging from a noose fashioned from a towel and a bedsheet.

7.      Mr. Thomas could not be revived, and he was pronounced dead at St. Luke's Hospital. He was 33 years old.

8.      Plaintiff Joan Thomas, Mr. Thomas's wife and the Administrator of his estate, now seeks on behalf of Ms. Thomas's estate and heirs, damages for the substantial pain and suffering, the loss of life, and the financial losses caused by the defendants' conduct.

## II.  JURISDICTION

9.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III.  PARTIES

10.     Decedent Christopher Thomas was at all times relevant to this Complaint a resident of Lehighton, Pennsylvania. He died at the age of 33 on July 4, 2023.

11.     Plaintiff Joan Thomas ("plaintiff"), the wife of decedent Christopher Thomas, (Mr. Thomas), was on June 11, 2025, appointed as the Administrator of

the Estate of Christopher Thomas. Plaintiff brings this action in her capacity as Administrator of the Estate and for the benefit of Mr. Thomas's heirs.

12.     Defendant PrimeCare Medical, Inc. is a medical provider, which has contracted with Carbon County to provide all medical services for people confined at Carbon County Correctional Facility.

13.     Defendant Carbon County is a municipal government entity in the Commonwealth of Pennsylvania, which manages and oversees the Carbon County Correctional Facility ("CCCF"), located at 331 Broad Street, Nesquehoning, PA 18240.

14.     At all times relevant to this Complaint, defendants Heather O'Donnell, LPC, Ashley Simmers, LPC, Megan Serpico, RN, Tracy Kenion, LPN, and Dana Hunsinger, LPN, were counselors and nurses employed by defendant PrimeCare and assigned to work at CCCF.

15.     At all times relevant to this Complaint, defendants Correctional Officer James Jellyman, Assistant Deputy Warden Rimby, and Sergeant Eric Flexer were employed by defendant Carbon County to work at CCCF.

16.     At all times relevant to this Complaint, all defendants acted under color of state law.

17.    At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to the Estate of Christopher Thomas and Mr. Thomas's heirs.

## IV.  FACTUAL ALLEGATIONS

### A.  Defendants' Knowledge of Suicide Risk Factors and Necessary Suicide Prevention Measures

18.    It is well recognized by professionals working in the correctional environment, including all defendants in this matter, that prisoner populations include many persons with serious mental illness and specialized mental health needs.

19.    It is additionally well recognized by professionals working in the correctional environment, including all defendants in this matter, that prisoners with mental health needs are at substantial risk for attempting suicide while incarcerated.

20.    Professionals working in the correctional environment, including all defendants in this matter, are aware of the specific factors that put a prisoner at risk to attempt suicide, including, but not limited to, a history of mental illness, especially a history of serious psychiatric diagnoses including Bipolar Disorder, depression, and Post-Traumatic Stress Disorder ("PTSD"), a recent history of suicide attempts, and estrangement from loved ones.

21.     Professionals working in the correctional environment, including all defendants in this matter, are aware that the vast majority of deaths by suicide in jails and detention facilities occur within the first few weeks of a person's incarceration, and a significant percentage occur within the first week.

22.     Professionals working in the correctional environment, including all defendants in this matter, are aware of several recognized methods to mitigate the risk of suicide for an incarcerated person who presents with significant and acute risk factors, including, but not limited to: enhanced mental health interventions, such as evaluations and treatment by a psychiatrist; continued suicide risk assessments and suicide precautions, including restrictions on access to items that could be used to cause harm or death; placement of the incarcerated person on suicide watch to be supervised by trained medical health staff; and careful review of mental health history before lessening restrictions or approving transfers to general population housing.

**B. Mr. Thomas's Suicide Attempt, Arrest, and Detention at CCCF**

23.     On June 26, 2023, Mr. Thomas was admitted to CCCF after an arrest on two counts of Aggravated Assault, and related charges, stemming from a domestic dispute with his wife.

24.     In the days before his arrest, Mr. Thomas was experiencing a prolonged mental health crisis, which included a suicide attempt on June 24, 2023,

that resulted in a brief psychiatric evaluation at St. Luke's Hospital. That suicide

attempt was not Mr. Thomas's first. He had previously tried to kill himself in 2018

and 2019.

25.     The evening after the June 24, 2023, suicide attempt, Mr. Thomas's

erratic behavior intensified. Following an argument and altercation at his home

with his wife, plaintiff Joan Thomas, Mr. Thomas fled to the nearby woods where

he stabbed himself multiple times in the neck and arms in an attempt to kill

himself.

26.     Mr. Thomas was found by state police covered in his own blood. He

was transported to St. Luke's Hospital Emergency Department. There, doctors

attempted to repair five different wounds, including a 10-centimeter laceration on

his neck which had hit his jugular vein and carotid artery.

27.     Once Mr. Thomas was medically cleared at the hospital, he was

transported to CCCF where he was admitted on charges related to the altercation

with his wife.

**C. Mr. Thomas's Particular Vulnerability to Suicide While Incarcerated**

28.     Mr. Thomas arrived to CCCF in a suicide smock and stated several

times he wanted to kill himself. For example, Mr. Thomas told staff, "I'd rather be

dead than in this fucking place… I'll be dead before I stay here more than 24

hours."

29.     Mr. Thomas's suicidal statements at CCCF were recorded on an authorization for suicide watch dated June 26, 2023, and signed by a CCCF correctional officer.

30.     During the early hours of June 27, 2023, Mr. Thomas met with defendant Megan Serpico, RN, to complete an Intake Suicide Screening. In that assessment, defendant Serpico indicated a number of factors suggesting Mr. Thomas was at a high risk of suicide. Those factors included:

     a.  The details of Mr. Thomas's recent arrest and suicide attempt;

     b.  Mr. Thomas's past mental health treatment, including diagnoses of Bipolar Disorder, Major Depressive Disorder, General Anxiety Disorder, and Post-Traumatic Stress Disorder;

     c.  Mr. Thomas's current thoughts of suicide at CCCF; and

     d.  Mr. Thomas's generally bizarre appearance and behavior.

31.     Defendant Serpico also spoke with a nurse at St. Luke's Hospital Emergency Department who informed her that a laceration on Mr. Thomas's neck had to be re-sutured four times during the emergency department admission because Mr. Thomas was found sticking his finger directly into the wound to pull the sutures apart.

32.     Mr. Thomas was placed on one-to-one monitoring, the highest level of suicide precaution at CCCF.

33.    Given the prominent nature of Mr. Thomas's lacerations, especially those on his neck, anyone at CCCF who interacted with him was aware that he was particularly vulnerable to suicide.

34.    Given the size of CCCF, with its small number of staff and incarcerated people, and in light of the sensational details of Mr. Thomas's suicide attempt, all CCCF staff who interacted with him were aware that he was particularly vulnerable to suicide.

35.    Defendant Serpico also confirmed Mr. Thomas's recent mental health treatment, including his twice weekly meetings with St. Luke's University Health Network Psychiatric Associates, and his list of medications. These included:

    a.  Clonazepam: a benzodiazepine used for treating seizures and some panic disorders;

    b.  Carbamazepine: an anticonvulsant medication sometimes used to treat manic episodes in Bipolar I Disorder;

    c.  Duloxetine (brand name, Cymbalta): an antidepressant; and

    d.  Lithium: a medication used to treat manic episodes in Bipolar I Disorder.

36.    The risk factors evident from the Intake Suicide Screening, details of Mr. Thomas's hospitalization, and his mental health treatment history were all

recorded in defendant PrimeCare's electronic medical chart in the early morning of June 27, 2023.

37.    From that point forward, all PrimeCare employees who viewed the chart during the course of their interactions with Mr. Thomas, including defendants O'Donnell, Simmers, Kenion, and Hunsinger, were aware that Mr. Thomas was particularly vulnerable to suicide and required significant suicide precautions.

**C. Defendants' Failure to Maintain Adequate Suicide Precautions**

38.    On June 27, 2023, at 12:24 pm, defendant Heather O'Donnell, LPC, conducted a Suicide Risk Assessment, indicating that Mr. Thomas expressed that he wanted to die, acted impulsively, and was experiencing a major depressive episode. His suicide risk was noted to be "Severe," and he was placed on Level I psychiatric watch.

39.    Level I suicide precautions include checks by staff at 15-minute intervals; no access to sharp items, belts, shoelaces, writing materials, underwear, or bedding; the use of a suicide smock; and meals limited to finger foods.

40.    Mr. Thomas remained on Level I psychiatric watch for seven days, during which time he was observed by mental health staff conducting daily suicide rounds. Throughout that time, Mr. Thomas continued to show clear and obvious signs of suicidal ideation.

41.    For example, during a mental health sick call conducted by defendant Heather O'Donnell on June 28, 2023, Mr. Thomas mentioned multiple prior psychiatric hospitalizations, explained the details of his recent suicide attempt and arrest, and stated, "You know you get to a place in life when you realized [sic] you should kill yourself."

42.    During a mental health sick call conducted by defendant Ashley Simmers, LPC, on Friday June 30, 2023, Mr. Thomas explained ongoing problems in his relationship with his wife. Defendant Simmers noted this "strained relationship" as a risk factor for suicide.

43.    Despite her knowledge of Mr. Thomas's history and ongoing risk factors, after the June 30, 2023 sick call, defendant Simmers listed the following treatment plan: "consider [discharge to suicide risk 2] at next meeting if no new risk factors or [suicidal ideation with] plan."

44.    Over the following weekend, Mr. Thomas refused a routine detox appointment with Dana Hunsinger, LPN, on Saturday, July 1, 2023.

45.    Defendant Tracy Kenion also conducted multiple suicide rounds during Mr. Thomas's first seven days at CCCF, including on July 2, 2023. For each round, she copied and pasted identical, generic notes into Mr. Thomas's chart, rather than documenting a substantive, updated assessment of his symptoms.

46.    At 10:48 am on Monday, July 3, 2023, defendant O'Donnell removed Mr. Thomas from Level I psychiatric watch, and placed him on a lower protective status, Level II.

47.    Level II status included checks at 15-minute intervals and no access to sharp items, belts, shoelaces, writing materials, sheet or a pillowcase, but allowed use of a pillow and suicide blanket.

48.    Despite ordering the discontinuation of Level I psychiatric watch at 10:48 am on July 3, 2023, defendant O'Donnell did not complete a Suicide Risk Assessment with Mr. Thomas until 2:22 pm that afternoon. At that time, she indicated Mr. Thomas was "being considered for step-down on suicide watch," despite the fact that the step-down had already been ordered.

49.    O'Donnell once again noted Mr. Thomas's impulsiveness and listed his suicidal risk as "Moderate."

50.    As of the afternoon of July 3, it was clear to all defendants that Mr. Thomas remained at risk of harming himself and that precautions to prevent that from occurring were required.

51.    Despite that knowledge, less than 24 hours after stepping Mr. Thomas down to Level II psychiatric watch and confirming he posed a moderate risk of committing suicide, at 10:14 am on July 4, 2023, defendant O'Donnell stepped him down yet again, removing almost all protective precautions.

52.     O'Donnell discontinued Level II psychiatric watch and initiated Level III watch.

53.     O'Donnell ordered this change in watch status before she conducted a Suicide Risk Assessment, which she did not do until 12:45 pm.

54.     Level III watch involves no suicide restrictions, only checks by a housing unit correctional officer at thirty-minute intervals.

55.     The step-down to Level III also resulted in Mr. Thomas's removal from the CCCF medical unit, where he had been in close proximity to medical and mental health staff, and placement in a general population unit.

56.     Shortly after defendant O'Donnell removed suicide precautions for Mr. Thomas, defendants Assistant Deputy Warden Rimby and Sergeant Eric Flexer reclassified Mr. Thomas to the Maximum Housing Unit, and he was moved there at 10:35 am.

57.     At the time Mr. Thomas was moved to the Maximum Housing Unit, he had a MRSA infection at the site of the wounds from his suicide attempt. CCCF's infection control policies required placement of Mr. Thomas in a single cell, without a cellmate—a placement known to all defendants as a significant suicide risk factor.

58.     As part of his step down to Level III watch and transfer to the

Maximum Housing Unit, CCCF provided Mr. Thomas with the towel and sheet he

would use to kill himself in a single cell.

### D. Defendants' Failure to Properly Monitor Mr. Thomas's Cell, and Mr. Thomas's Suicide

59.     As a result of the actions of defendants O'Donnell, Simmers, Serpico,

Kenion, Hunsinger, Rimby, and Flexer, Mr. Thomas was housed on a unit staffed

only by correctional officers. He was no longer seen for suicide rounds, and he had

no immediate access to, or oversight by, mental health staff. He had no one else

residing in his cell.

60.     As these defendants were aware, the minimal intervention resulting

from the thirty-minute watch protocol initiated on July 4, 2023, did not constitute a

suicide precaution and was insufficient to protect a person who was particularly

vulnerable to suicide.

61.     On the afternoon of July 4, 2023, defendant Officer Jellyman was the

correctional officer responsible for implementing the thirty-minute watch protocol.

62.     That protocol required a correctional officer to look into Mr.

Thomas's cell at staggered time periods at least once every thirty minutes.

63.     Based on Mr. Thomas's status on Level III watch, his transfer from

the medical unit where he was being monitored for suicidal ideation to the

Maximum House Unit earlier that day, discussions among the CCCF staff

regarding the sensational facts of Mr. Thomas's suicide attempt, and the visible signs of his recent self-harm, defendant Jellyman was aware of Mr. Thomas's particular vulnerability to suicide.

64.    Defendant Jellyman knew the thirty-minute watch protocol had been ordered to ensure Mr. Thomas's safety and, likewise, knew that he was required to fulfill the protocol's mandates and accurately record both the time and nature of his observations.

65.    Defendant Jellyman recorded checking on Mr. Thomas in his cell at 3:00 pm, 3:28 pm, and 3:58 pm.

66.    Another correctional officer, with initials "BG," recorded observing Mr. Thomas in his cell at 4:30 pm.

67.    Defendant Jellyman then recorded three additional checks between 4:30 pm and 5:30 pm. The handwritten log reporting these checks shows that defendant Jellyman failed to conduct checks as required:

   a.  The time of the first observation is not clearly written;

   b.  The time of the second observation was altered to read 5:10 pm, while the originally recorded time and the time the alteration was made are unclear;

   c.  The time of the third observation, when self-injurious behavior is first noted, reads 5:20 pm; other records, however, show that at

5:20 pm Mr. Thomas was seen standing at the door of his cell and that no self-injurious behavior was observed until 5:30 pm.

68.     In fact, at 5:30 pm, Mr. Thomas was found in his cell with a towel around his neck and the towel tied to a sheet that was wrapped around the top bunk of his bed.

69.     An emergency alert was issued and two additional correctional officers as well as PrimeCare nursing staff responded.

70.     They were unable to resuscitate Mr. Thomas. He was transported via ambulance to St. Luke's Hospital – Coaldale Campus, where he was pronounced dead at 6:47 pm.

71.     The cause of death listed was cardiac arrest.

### E. The Defendants' Violation of Mr. Thomas's Constitutional and Federally Protected Rights and Relevant Standards of Care

72.     Defendants O'Donnell, Simmers, Serpico, Kenion, Hunsinger, Jellyman, Rimby, and Flexer were aware of Mr. Thomas's particular vulnerability to suicide.

73.     Notwithstanding their knowledge of Mr. Thomas's particular vulnerability to suicide, defendants O'Donnell, Simmers, Serpico, Kenion, Hunsinger, Jellyman, Rimby, and Flexer, with deliberate indifference and in violation of relevant standards of care, failed to take actions to address Mr. Thomas's vulnerability to suicide.

16

74.    Defendants O'Donnell, Simmers, Serpico, Kenion, Hunsinger, Rimby, and Flexer failed to ensure Mr. Thomas was maintained on sufficient suicide precautions given his ongoing particular vulnerability to suicide.

75.    Instead, defendants O'Donnell, Simmers, Serpico, Kenion, Hunsinger, Rimby, and Flexer allowed Mr. Thomas to be stepped down twice in the course of eight days at CCCF and then transferred to a general housing unit with no suicide-specific restrictions in place, despite his continuing to exhibit signs of suicidal ideation.

76.    Defendant Jellyman failed to observe Mr. Thomas in his cell in compliance with the thirty-minute watch protocol and failed to accurately document the time and nature of his observations.

77.    Mr. Thomas's suicide was the direct and proximate result of the defendants' failures as outlined above.

78.    At all times relevant to this Complaint, as evidenced by the failures outlined above, defendants PrimeCare and Carbon County, with deliberate indifference, failed to properly train, supervise and discipline their respective employees so as to ensure that prisoners in the position of Mr. Thomas would be treated in a way that would mitigate significant risks of suicide.

79.    In particular, defendant PrimeCare failed to enact policies, practices and procedures and/or ensure training regarding the need to maintain suicide

precautions and approve step downs only after the risk of self-harm had appropriately abated.

80.    Further, defendant Carbon County failed to enact policies, practices and procedures, and/or ensure training regarding, among other things, the appropriate circumstances to transfer an incarcerated person from mental health watch to general housing and the need to comply with watch protocols instituted by medical and/or mental health staff.

81.    The risk of harm to prisoners like Mr. Thomas in the absence of appropriate policies, practices, and procedures and/or appropriate training supervision, and discipline was obvious and apparent to defendants PrimeCare and Carbon County.

82.    Given his diagnosed mental health conditions, Mr. Thomas was a qualified individual with a disability under federal law.

83.    When Mr. Thomas was deprived of appropriate mental health interventions as outlined above, he was deprived of services, programs, or activities of defendant Carbon County, by reason of his disability.

84.    At all times relevant to this Complaint, the conduct of all defendants was in willful, reckless, and callous disregard of Mr. Thomas's rights under federal and state law.

85.     As a direct and proximate result of the conduct of all defendants, Mr. Thomas experienced enormous physical and emotional pain and suffering.

86.     As a direct and proximate result of the conduct of all defendants, Mr. Thomas was caused to lose his life and the enjoyment of his life, including complete loss of earnings and earnings capacity.

## V.    WRONGFUL DEATH AND SURVIVAL ACTIONS

87.     Plaintiff, as Administrator of the Estate of Christopher Thomas, brings this action on behalf of Mr. Thomas's heirs under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

88.     Mr. Thomas's heirs under the Wrongful Death Act are:

a.  His wife, plaintiff Joan Thomas;

b.  His minor son, L.T.; and

c.  His minor daughter, B. T.

89.     Mr. Thomas did not bring an action against defendants for damages for the injuries causing his death during his lifetime.

90.     Mr. Thomas's heirs have, by reason of Mr. Thomas's death, suffered pecuniary loss, and have or will incur expenses for the costs of Mr. Thomas's funeral, the costs of Mr. Thomas's headstone, and the costs of administering Mr. Thomas's estate.

91.     Mr. Thomas's heirs have, by reason of Mr. Thomas's death, suffered further pecuniary loss including expected contributions and financial support from Mr. Thomas for food, clothing, shelter, medical care, education, entertainment, recreation, and gifts.

92.     Plaintiff also brings this action on behalf of the Estate of Christopher Thomas under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which all claims Mr. Thomas would have been able to bring had he survived may be brought by Mr. Thomas's estate.

93.     Mr. Thomas's estate has, by reason of Mr. Thomas's death, suffered pecuniary loss, and has or will incur expenses for the costs of Mr. Thomas's funeral, the costs of Mr. Thomas's headstone, and the costs of administering Mr. Thomas's estate.

94.     As a direct and proximate result of the conduct of all defendants, Mr. Thomas experienced extraordinary physical and emotional pain and suffering before his death, and, as a result of his death, suffered the loss of the enjoyment of his life and complete loss of earnings and earnings capacity.

95.     Plaintiff, via this survival action, seek damages for these harms caused to Mr. Thomas.

# VI.  CLAIMS FOR RELIEF

### COUNT 1
### Plaintiff v. Defendants O'Donnell, Simmers, Serpico,
### Kenion, Hunsinger, Jellyman, Rimby, and Flexer
### Federal Constitutional Claims

96.     Defendants O'Donnell, Simmers, Serpico, Kenion, Hunsinger, Jellyman, Rimby, and Flexer were deliberately indifferent to Mr. Thomas's particular vulnerability to suicide and to his serious mental health needs, and thereby violated Mr. Thomas's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or his right to due process of law under the Fourteenth Amendment to the United States Constitution.

### COUNT 2
### Plaintiff v. Defendants Carbon County and PrimeCare
### Federal Constitutional Claims

97.     The violations of Mr. Thomas's constitutional rights under the Eighth and /or Fourteenth Amendment to the United States Constitution, the conduct of the individual defendants, and plaintiff's damages were directly and proximately caused by the actions and/or inactions of defendant Carbon County and PrimeCare, which have, with deliberate indifference, failed to establish policies, practices, and procedures and/or has failed to properly train, supervise and discipline their employees regarding the protection of suicidal incarcerated people and the provision of adequate mental healthcare as outlined above.

**COUNT 3**
**Plaintiff v. Defendant Carbon County**
**Title II, Americans with Disabilities Act, 42 U.S.C. § 12132**

98.     Mr. Thomas was a qualified individual with a disability as defined

under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131.

99.     Defendant Carbon County is a public entity as defined under Title II

of the Americans with Disabilities Act, 42 U.S.C. § 12131.

100.    Defendant Carbon County, with deliberate indifference, failed to

ensure the adoption of procedures and protocols to perform adequate mental health

risk assessments and obtain mental health interventions for prisoners in its custody,

and, as such deprived Mr. Thomas of the benefits of Carbon County's services,

programs, or activities on account of his disability.

**COUNT 4**
**Plaintiff v. Defendant O'Donnell, Simmers, Serpico, Kenion, and Hunsinger**
**State Law Negligence Claims**

101.    Defendants O'Donnell, Simmers, Serpico, Kenion, and Hunsinger had

a duty to comply with generally accepted medical and mental health standards of

care in their treatment of Mr. Thomas.

102.    Defendants O'Donnell, Simmers, Serpico, Kenion, and Hunsinger

violated their duty of care.

103.    Defendants O'Donnell, Simmers, Serpico, Kenion, and Hunsinger's

violation of their duty of care to Mr. Thomas was a direct and proximate cause and

a substantial factor in bringing about plaintiff's damages as outlined above, and, as a result, defendants O'Donnell, Simmers, Serpico, Kenion, and Hunsinger are liable to plaintiff.

## VII.  REQUESTED RELIEF

**Wherefore**, plaintiff respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants O'Donnell, Simmers, Serpico,

Kenion, Hunsinger, Jellyman, Rimby, and Flexer;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.


/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
I.D. No. 88227
jfeinberg@krlawphila.com


/s/ Grace Harris
Grace Harris
I.D. No. 328968
gharris@krlawphila.com

KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)

*Counsel for Plaintiff*